No. 26-30154

# In the United States Court of Appeals for the Fifth Circuit

FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; LOUISIANA SHOOTING ASSOCIATION,

*Plaintiffs-Appellants,*

V.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; ROBERT CEKADA, DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; TODD WALLACE BLANCHE, ATTORNEY GENERAL,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA, No. 6:20-cv-01438

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

George J. Armbruster, III
ARMBRUSTER & ASSOCIATES, APLC
332 E. Farrel Road, Suite D
Lafayette, LA 70508
(337) 889-5511
george@arm-assoc.com

David H. Thompson
*Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| ***Plaintiffs-Appellants*** | ***Counsel for Plaintiffs-Appellants*** |
|---|---|
| Second Amendment Foundation<br><br>Firearms Policy Coalition, Inc.<br><br>Louisiana Shooting Association | David H. Thompson<br>Peter A. Patterson<br>William V. Bergstrom<br>COOPER & KIRK, PLLC<br><br>George J. Armbruster, III<br>ARMBRUSTER & ASSOCIATES, APLC<br><br>Joseph G.S. Greenlee*<br>FPC ACTION FOUNDATION<br><br>John W. Dillon*<br>DILLON LAW GROUP<br><br>Raymond M. DiGuiseppe*<br>DIGUISEPPE LAW FIRM<br><br>Adam Kraut*<br>SECOND AMENDMENT FOUNDATION |
| ***Defendants-Appellees*** | ***Counsel for Defendants-Appellees*** |
| Bureau of Alcohol, Tobacco, Firearms and Explosives<br><br>Robert Cekada, in his official capacity as ATF Director<br><br>Todd Wallace Blanche, in his official | Steven H. Hazel<br>Daniel M. Riess<br>Brett A. Shumate<br>Brad Hinshelwood<br>U.S. DEPARTMENT OF JUSTICE |

| | |
|---|---|
| capacity as Attorney General of the United States | |

Attorneys whose names are denoted with an asterisk entered appearances in the district court but have not entered appearances in the Fifth Circuit.

Dated: November 4, 2026

/s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSIONS ....................................................... i
TABLE OF AUTHORITIES ........................................................................... iv
INTRODUCTION ........................................................................................ 1
ARGUMENT ............................................................................................. 2
I. This Case Is Not Moot. ........................................................................ 2
II. The District Court's Injunction Was Unjustifiably Narrow. ........................ 15
CONCLUSION ........................................................................................ 25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arizona v. United States*,
567 U.S. 387 (2012)....................9

*Chafin v. Chafin*,
568 U.S. 165 (2013)....................3, 4

*Christian Emps. All. v. U.S. Equal Emp. Opportunity Comm'n*,
719 F. Supp. 3d 912 (D.N.D. 2024)....................20

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982)....................4, 5

*Elec. Frontier Found. v. U.S. Dep't of Just.*,
739 F.3d 1 (D.C. Cir. 2014) ....................6, 7

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................18

*Firearms Pol'y Coal., Inc. v. Bondi*,
805 F. Supp. 3d 721 (N.D. Tex. 2025)....................19

*Freedom from Religion Found., Inc. v. Abbott*,
58 F.4th 824 (5th Cir. 2023)....................4, 5

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................16, 17, 23

*Int'l Union, United Auto. Workers v. Brock*,
477 U.S. 274 (1986)....................16, 19, 24

*Mallory v. Norfolk S. Ry. Co.*,
600 U.S. 122 (2023)....................23

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023)....................21, 22

*Reese v. BATFE*,
127 F.4th 583 (5th Cir. 2025)....................2, 3

*Silencer Shop Found. v. BATFE*,
No. 6:25-cv-56, 2026 WL 2255460 (N.D. Tex. Aug. 5, 2026) ....................19

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020)....................4, 5

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019)....................5

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023)....................12

*Students for Fair Admissions, Inc. v. University of Texas at Austin,*
142 F.4th 819 (5th Cir. 2025)....................12

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017)....................13

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................2, 21, 25

*U.S. Navy SEALs 1-26 v. Biden*,
72 F.4th 666 (5th Cir. 2023).................... 12

*United States v. Arizona*,
641 F.3d 339 (9th Cir. 2011)....................9, 10

*Worth v. Jacobson*,
108 F.4th 677 (8th Cir. 2024)....................16

**Rules**

FED. R. CIV. P. 23....................24

**Other Authorities**

*Application of 18 U.S.C. § 922(b)(1) and (c)(1) to Young Adults*, 50 Op. O.L.C. __,
(Sept. 17, 2026), https://perma.cc/XLE3-5J2G....................3

*Application of the Anti-Nepotism Statute to a Presidential Appointment in the White House Office*, 41 Op. O.L.C. 49 (Jan. 20, 2017),
https://perma.cc/Q374-BAAH ....................7, 8

Br. for Appellee, *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Just.*, No. 18-5116 (D.C. Cir. Sept. 28, 2018), 2018 WL 4680141 ....................6, 7

Josh Blackman, *A Tale of Two OLCs*, REASON (July 31, 2021),
https://perma.cc/W4LL-JEBC....................9

*Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. 151 (June 13, 2019),
https://perma.cc/48XB-JURV....................8, 9

Governor Kathy Hochul (@GovKathyHochul), X (Sept. 19, 2026, 6:56 PM EST),
https://perma.cc/TJ95-VQ9W....................11

*Legal Standards Applicable Under 18 U.S.C. §§ 2340–2340A*, 28 Op. O.L.C. 297 (Dec. 30, 2004), https://perma.cc/74W2-7BFK ........................................7, 8

Letter from Sen. Christopher S. Murphy et al. to Attorney General Todd Blanche (Oct. 16, 2026), https://perma.cc/4U53-H2FC .......................................10, 11

Letter from D. John Sauer, Solicitor General, to Mike Johnson, Speaker of the U.S. House of Representatives re *Reese v. ATF*, No. 23-30033 (5th Cir. Jan. 30, 2025) (July 25, 2025), https://perma.cc/537V-G2BP ....................................13

Letter from D. John Sauer, Solicitor General, to Mike Johnson, Speaker of the U.S. House of Representatives re *Silencer Shop Found. v. ATF*, No. 25-cv-056 (N.D. Tex.) (Sept. 24, 2025), https://perma.cc/649C-BZSR ...................19, 20

Memorandum for the Attorneys of the Office, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Best Practices for OLC Opinions* (July 16, 2010), https://perma.cc/E4CK-U7V ..............6, 7, 11

Order, *Firearms Pol'y Coal., Inc. v. Blanche*, No. 25-11328 (5th Cir. July 23, 2026), Doc. 56 ..........................................................................19, 20

*Reconsideration of Applicability of the Davis-Bacon Act to the Veterans Administration's Lease of Medical Facilities*, 18 Op. O.L.C. 109 (May 23, 1994), https://perma.cc/F3B9-UKMG.......................................................7, 8

*Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158 (Nov. 2, 2018), https://perma.cc/5LFP-AVB7........................7, 11

*Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. ___ (July 30, 2021), https://perma.cc/ZUG3-L5BP .......................................9

## INTRODUCTION

The Government's brief suggests that this case no longer presents a live controversy because the Government has voluntarily ceased enforcement of its ban on 18-to-20-year-olds acquiring firearms nationwide. It then argues that expanding the scope of the injunction in this case to cover all affected members of the Plaintiff Organizations not only would exceed the authority of this Court but also would be inequitable and unfair to the extent it would interfere with the adjudication of these issues in other circuits or permit future members of the Plaintiff Organizations to take advantage of an injunction against a law the Government *agrees is unconstitutional*. Both of these arguments cannot have merit; in fact, neither does. This case is not moot merely because the Government has, or at least asserts it has, ceased enforcing the restrictions at issue. To the extent the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has adopted the Office of Legal Counsel's ("OLC") legal analysis as its own agency policy, that policy was easily issued, and could just as easily be withdrawn. The Government bears a heavy burden in proving that there is no possibility that the Plaintiff Organizations' 18-to-20-year-old members could face threats of enforcement in the future if they attempt to buy a handgun from a federally licensed dealer. The current OLC directive not to enforce the law fails to meet that standard.

As for the scope of relief, the Government argues in several different ways that the Supreme Court's decision in *Trump v. CASA*, *Inc.*, 606 U.S. 831 (2025), forbids an injunction that provides a complete remedy in this case because it would extend beyond the parties to reach everyone potentially affected by the ban. But that misunderstands the nature of this suit—the parties before the court include the Plaintiff Organizations, and under longstanding Supreme Court precedent the Plaintiff Organizations properly assert the ongoing harms their members are suffering. Appropriate relief—relief that actually remedies the Plaintiff Organizations' members' ongoing injuries—must therefore extend to those members. The objections the Government levels against Plaintiffs' proposed injunction tend to operate through this same error of mistaking the represented parties for the parties themselves. Fundamentally, the Government's arguments against association-wide relief are arguments against Supreme Court precedent itself. The Court has many times confronted these same concerns and held that associations have standing to sue and get relief for their members. Following that precedent requires revising the injunction issued below.

## ARGUMENT

### I. This Case Is Not Moot.

After this Court concluded that the ban on 18-to-20-year-olds acquiring handguns from licensed dealers violated the Second Amendment in *Reese v. BATFE*,

127 F.4th 583 (5th Cir. 2025), and the district court entered the injunction at the center of this appeal, and Plaintiffs filed their opening appellate brief, the Department of Justice's Office of Legal Counsel announced on September 17, 2026 that it belatedly agrees with Plaintiffs and this Court about the constitutionality of these restrictions. In an opinion that cited repeatedly to *Reese*, the Office concluded that "the modern federal age restrictions limit[ing] young adults between the ages of eighteen and twenty from obtaining arms … 'fall[] within the plain text of the Second Amendment,' " and, because the Office was not aware of " 'any analogue or collection of analogues' that 'is relevantly similar to the modern law,' " it concluded, as this Court did, that "the government is unable to overcome this presumption." *Application of 18 U.S.C. § 922(b)(1) and (c)(1) to Young Adults*, 50 Op. O.L.C. __, slip op. at 48 (Sept. 17, 2026), https://perma.cc/XLE3-5J2G ("OLC 18-20 Opinion") (citations omitted). As such, the Office concluded "Section 922(b)(1) and (c)(1) may not be enforced to impose criminal penalties on dealers who sell handguns to a class of law-abiding adults." *Id.* at 1.

The Government now argues that the issuance of this opinion moots this case. Br. for Defs., Doc. 53 at 7–11 (Oct. 5, 2026) ("Gov't Br."). It does not. "[A] case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.' " *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation marks and citation omitted). " 'As long as the parties have a concrete

interest, however small, in the outcome of the litigation, the case is not moot.' " *Id*. Here, the Government contends there is no effectual relief for this Court to offer because the OLC's opinion effectively ends any threat of future enforcement of the federal 18-to-20 ban. According to the Government, because the threat of enforcement has ceased, so has the need for any injunction.

The Government's theory of mootness does not satisfy voluntary cessation doctrine. According to that doctrine, "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (cleaned up). "The test for mootness in cases such as this is a stringent one." *Id.* "[A] defendant's voluntary conduct moots a case only if 'it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Freedom from Religion Found., Inc. v. Abbott*, 58 F.4th 824, 833 (5th Cir. 2023) (quoting *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011)). "In some cases this court has 'treat[ed] a voluntary governmental cessation of possibly wrongful conduct with some solicitude,' " *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) (quoting *Sossamon*, 560 F.3d at 325), "because [courts] presume that state actors, as public representatives, act in good faith," such that "without evidence to the contrary, [courts] assume that formally announced changes to official

government policy are not mere litigation posturing," *Freedom from Religion*, 58 F.4th at 833 (second quoting *Sossamon*, 560 F.3d at 325).

That said, whether an announced change in policy moots a case depends in part on how the change was made and whether the change does in fact make it "absolutely clear" that the dispute will not recur. For example, this Court has held that "mootness is the default" where the challenge is to a statute and the statute has been repealed. *Id.* at 832 (collecting cases). But even a legislative change may not be enough if it is clear that the policy would be reversed if the court were to drop the issue. *See City of Mesquite*, 455 U.S. at 289 & n.10 (rejecting a mootness argument because "the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated" and noting that the city had done just that in a previous case). On the other hand, "where a change is merely regulatory, the degree of solicitude the voluntary cessation enjoys is based on whether the regulatory processes leading to the change involved legislative-like procedures or were ad hoc, discretionary, and easily reversible actions." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019); *see also Fenves*, 979 F.3d at 328 (relying on *Schlissel*). This Court has also considered "(1) the absence of a controlling statement of future intention; (2) the suspicious timing of [a policy] change; and (3) the [defendant's] continued defense of the challenged policies" as reasons to reject mootness. *Fenves*, 979 F.3d at 328.

In this case, the OLC opinion, laudable though it is, falls well short of making "absolutely clear" that this controversy will not recur. First, consider the process by which an OLC opinion is published. The Office "exercises the Attorney General's authority under the Judiciary Act of 1789 to provide the President and executive agencies with advice on questions of law." Memorandum for the Attorneys of the Office, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Best Practices for OLC Opinions* at 1 (July 16, 2010), https://perma.cc/E4CK-U7V7 ("2010 Best Practices Memo"). At the request of an agency or Executive Branch official, the Office may issue a formal opinion on the legality of some course of action or the interpretation of some question of law. In doing so, it ordinarily solicits the agency's own views of the matter first and then researches, drafts, and ultimately issues its legal advice in a written memorandum. *Id.* at 2–4. Although the Government asserts that such opinions are "generally viewed as … binding interpretive guidance for executive agencies," Gov't Br. at 8 (quoting *Casa de Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 692 n.1 (4th Cir. 2019)), the OLC is not the agency itself, and agencies still ultimately may choose not to follow the legal advice they are provided, as the Government has elsewhere acknowledged. *See* Br. for Appellee, *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Just.*, No. 18-5116 (D.C. Cir. Sept. 28, 2018), 2018 WL 4680141, at *13 ("OLC does not set policies or direct agencies to adopt particular interpretations,

but provides advice to policymaking agencies about their available options."); *see also Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 9 (D.C. Cir. 2014) ("That the OLC Opinion bears these indicia of a binding legal decision does not overcome the fact that the OLC does not speak with authority on the FBI's policy."). Here, this Court cannot find the dispute moot because the Government has offered *no evidence* that the actual Defendant in this case, ATF, has ceased enforcement or instructed licensed dealers to process handgun purchases by 18-to-20-year-olds.

Even if this Court were to treat OLC's opinion as having effected a change in practice at the ATF, that would not lead to a different result. OLC opinions are not written in stone; although the Office has cautioned its attorneys they "should not lightly depart from … past decisions [involving constitutional questions], particularly where they directly address and decide a point in question, … as with any system of precedent, past decisions may be subject to reconsideration and withdrawal in appropriate cases and through appropriate processes." 2010 Best Practices Memo at 2. Indeed, the OLC has revisited prior opinions and reversed course on many occasions based on nothing more than disagreeing with its own prior legal reasoning. *See Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158, 177–79 & nn.13–17 (Nov. 2, 2018), https://perma.cc/5LFP-AVB7 ("2018 Wire Act Opinion") (collecting examples); *see also, e.g.*, *Application of the Anti-Nepotism Statute to a Presidential Appointment in*

*the White House Office*, 41 Op. O.L.C. 49, 58 (Jan. 20, 2017), https://perma.cc/Q374-BAAH (recognizing that the opinion "departs from some of [the OLC's] prior work" addressing the same question but asserting that "departure is fully justified" because "[o]ur initial opinions on the subject drew unwarranted inferences about Congress's intent from a single witness statement in a congressional hearing" and because "the surrounding legal context has been transformed"); *Legal Standards Applicable Under 18 U.S.C. §§ 2340–2340A*, 28 Op. O.L.C. 297, 298 (Dec. 30, 2004), https://perma.cc/74W2-7BFK (superseding 2002 memorandum on the same topic which had been publicly withdrawn prior to the preparation of "a replacement memorandum" which disagreed with its conclusions); *Reconsideration of Applicability of the Davis-Bacon Act to the Veterans Administration's Lease of Medical Facilities*, 18 Op. O.L.C. 109, 124 (May 23, 1994), https://perma.cc/F3B9-UKMG (reversing a prior opinion, released six years before on the same topic, concluding that it had misinterpreted "the plain language of the Davis-Bacon Act").

In one particularly high-profile recent example of the Office reversing itself, it concluded in 2019 that the Department of the Treasury was not obligated to disclose President Trump's tax returns to the House Ways and Means Committee, *see Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. 151 (June 13, 2019), https://perma.cc/48XB-JURV ("2019 Tax Opinion"), and then two years later, concluded that the Treasury *was*

obligated to disclose former-President Trump's tax returns, *see Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. ___ (July 30, 2021), https://perma.cc/ZUG3-L5BP (slip op.) ("2021 Tax Opinion"). Although there were factual differences in the question presented in those two opinions—one dealt with the tax returns of a sitting president and the other dealt with the same taxes but after the president had left office—it was plain that the OLC under President Biden was critical of the reasoning of its prior opinion under President Trump, wholly apart from that distinction. *See* Josh Blackman, *A Tale of Two OLCs*, REASON (July 31, 2021), https://perma.cc/W4LL-JEBC. Among other things, for instance, the 2021 Tax Opinion criticized the 2019 Tax Opinion for "fail[ing] to give due weight to Congress's status as a co-equal branch of government with legitimate needs for information in order to exercise its constitutional authorities." 2021 Tax Opinion, slip op. at 19. Such flip-flopping between administrations is hardly novel. *See, e.g.*, *United States v. Arizona*, 641 F.3d 339, 365 n.24 (9th Cir. 2011), *aff'd in part, rev'd in part, and remanded sub nom. Arizona v. United States*, 567 U.S. 387 (2012) ("[L]egal opinions of Executive lawyers are not binding on federal courts. The OLC memo itself demonstrates why this is: the OLC's conclusion about the issue in the 2002 memo was different in 1996 under the direction of President Clinton, and was different in 1989, under the direction of President George H.W. Bush.").

This history provides a separate, sufficient ground on which to reject the Government's assertion of mootness in this case. Again, the Government's burden is to show that it is "absolutely clear" that Plaintiffs and their members face no reasonable future threat of enforcement of 18 U.S.C. § 922(b)(1) and (c)(1). The only basis for the Government's argument is its assertion that the OLC "opinion eliminates any prospect that plaintiffs or their members will be subject to enforcement action for violations of the challenged restrictions." Gov't Br. at 6. But as just demonstrated, OLC opinions can be and have been reversed before. And there are several reasons to conclude that Plaintiffs (unfortunately) reasonably fear reversal here. First, as the 2019 and 2021 Tax Opinions tend to demonstrate, reversal may result from an opinion touching on a highly politicized issue on which different administrations are likely to hold divergent views. Here, there is a strong probability that a different administration may well take a very different view of these laws. Following the issuance of the OLC's opinion on the law at issue in this case, 20 Democratic Senators sent a letter to the Attorney General to "request information regarding the analysis underlying [the] decision" because, they claimed, the "decision raises serious questions about the Department's execution of federal law, its communications with members of the gun industry, and the implications for the enforcement of federal firearms laws nationwide." Letter from Sen. Christopher S. Murphy et al. to Attorney General Todd Blanche (Oct. 16, 2026),

https://perma.cc/4U53-H2FC. The Senators expressed concern about "the public safety implications" of the decision and complained that the executive branch was ending an "ongoing…legal dispute" that had divided the circuit courts. *Id.* Given this strong, and partisan, divide over this issue, *see also, e.g.*, Governor Kathy Hochul (@GovKathyHochul), X (Sept. 19, 2026, 6:56 PM EST), https://perma.cc/TJ95-VQ9W (commenting on the OLC's opinion) ("Not in New York. No teenager should be able to walk into a gun store and buy a handgun."), it is far from "absolutely clear" that if the White House were to change hands, the OLC would not be asked to revisit this issue. And while the Office does not exist "merely to advance the policy preferences of the President or other officials," at the same time, "OLC's analyses may appropriately reflect the fact that its responsibilities also include facilitating the work of the Executive Branch and the objectives of the President, consistent with the law." 2010 Best Practices Memo at 2.

Moreover, the OLC has, in the past, favored reversing itself where "[r]eaching a contrary conclusion from our prior opinion will … make it more likely that the Executive Branch's view of the law will be tested in the courts," reasoning that such review "provide[s] a one-way check of the correctness" of a policy reversal that "weighs in favor of [a] change in position." 2018 Wire Act Opinion at 179–80. That, and the existence of an acknowledged circuit split from which a different OLC could

simply choose to take the other side, seriously undermine the Government's confident assertion of mootness here.

None of the cases the Government cites found mootness on such shaky grounds. In *U.S. Navy SEALs 1-26 v. Biden*, 72 F.4th 666 (5th Cir. 2023), for instance, a dispute over the military's vaccine mandate was rendered moot by the enactment of a statute that directed the Defense Secretary to rescind the mandate and the fact that the Navy had "promulgated multiple binding policies going beyond what Congress required to eradicate the effects of the mandate." *Id.* at 674. And in *Students for Fair Admissions, Inc. v. University of Texas at Austin, 142 F.*4th 819 (5th Cir. 2025), this Court found that a challenge to UT's consideration of race in admissions was moot because UT had, in the wake of the Supreme Court's decision in *Students for Fair Admissions, Inc. v. Presidents & Fellows of Harvard College*, 600 U.S. 181 (2023), "rescinded its race-conscious admissions policy and adopted a facially race-neutral policy." *Univ. of Tex. at Austin*, 142 F.4th at 825. This Court was satisfied that the change was permanent because it was made in response to new binding Supreme Court precedent, with which UT was bound to comply, so that even though UT could re-enact its race-conscious policy just as easily as it had discarded it, this Court concluded "UT is not 'otherwise unconstrained.' " *Id.* at 826–27.

This case is different. There is, as discussed above and forthrightly acknowledged in the OLC memo, a circuit split on the propriety of restrictions on

the Second Amendment protected rights of 18-to-20-year-old adults. The absence of binding Supreme Court precedent on the issue results at least in part from the Government's own conduct in *this case*, where it eschewed a petition for certiorari last year out of a different concern about mootness that never materialized. *See* Letter from D. John Sauer, Solicitor General, to Mike Johnson, Speaker of the U.S. House of Representatives re *Reese v. ATF*, No. 23-30033 (5th Cir. Jan. 30, 2025) (July 25, 2025), https://perma.cc/537V-G2BP. This case is much more like *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). In that case the Supreme Court rejected a mootness argument premised on the fact that the Governor of Missouri had directed the state to abandon the policy challenged by the suit because the state had not shown "that it could not revert to its [prior] policy." *Id.* at 457 n.1. So too here.

Concluding that the OLC opinion does not moot this case is entirely consistent with the presumption that government officials act in good faith and in no way suggests that "the OLC opinion—which was prepared at the Attorney General's request and concludes that an Act of Congress is unconstitutional—might constitute mere 'litigation posturing.' " Gov't Br. at 9 (quoting *SFFA*, 142 F.4th at 826). Indeed, Plaintiffs have no doubt that the OLC's opinion is both sincere and correct. But that does not mean that it will remain in place.

One final note on mootness. The Government also preemptively argues that this case is not exempt from mootness under the "capable of repetition yet evading review" doctrine. *Id.* at 10–11. Plaintiffs generally agree—the problem here is an inadequate voluntary cessation, which in turn means that the problem is capable of repeating, but that sort of factual scenario is properly analyzed under the rubric described above. That said, the Government's dismissive suggestion that this issue is not "too short for a challenge 'to be fully litigated' " because "multiple plaintiffs challenging the restrictions have succeeded in litigating their claim to final judgment," requires a response. *Id*. (quoting *U.S. Navy SEALs*, 72 F.4th at 675). That 18-to-20-year-olds have been able to litigate this issue in cases like this one is almost entirely dependent upon the ability to bring their suits alongside associations of which they are members and to achieve relief even for members who joined *after* the suit was filed. That is what happened in this case. *See* Br. of Pls.-Appellants, Doc. 34 at 21–22 (June 22, 2026) ("Pls.' Br."). This case was filed on November 6, 2020, almost exactly six years before the filing of this reply brief. If the Government had its way, an individual who wished to take advantage of Plaintiffs' victory in this case and purchase a handgun at retail as an 18-year-old would have to have joined at age 12 or else the Plaintiff Organizations would have to file a new suit on their behalf *today*. If that were the law, Plaintiff Organizations' claims *would be* capable

of repetition yet evading review, since this case has survived essentially two full "generations" of affected 18-to-20-year-old members.

## II. The District Court's Injunction Was Unjustifiably Narrow.

The Government argues that the OLC opinion here also weighs against correcting the erroneously narrow injunction issued below because the OLC opinion means that Plaintiffs lack an "irreparable injury" absent an injunction. Gov't Br. at 11. But for the same reasons why this case is not moot, the OLC opinion does not offer the enduring certainty that Plaintiffs and their members will not face future threats of enforcement that an injunction would eliminate.

The propriety of *any* injunctive relief aside, the Government defends the geographic and temporal restrictions the district court placed on its order granting Plaintiffs injunctive relief, but its arguments are contrary to binding Supreme Court precedent.

**A.** The Government argues that granting relief to all of Plaintiffs' members runs afoul of the principle that "a court may do no more than 'provide complete relief to each plaintiff with standing to sue,' " *id.* at 12 (quoting *CASA,* 606 U.S. at 861), because "Article III does not give federal courts the power to order relief to any uninjured plaintiff," *id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). It calls the idea that future members could benefit from the injunction "remarkable." *Id.* at 15. There are several problems with this argument. First, it

mistakes *who* is the party suing here. This theme runs throughout the Government's brief—it seeks to treat the members of the organizations as if they are, themselves, the plaintiffs. But this is nothing more than a rejection of the doctrine of associational standing itself, in which the Supreme Court has recognized that the associations *themselves* have standing to vindicate the rights of their members without requiring their members be parties to the litigation at all. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986) ("The doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others."). Thus, the Government is wrong when it asserts that Plaintiffs' having identified new members throughout the life of this case is tantamount to having amended the complaint. *See* Gov't Br. at 22. Rather, the identification of those members merely served to show the *associational plaintiffs*' injury was ongoing so that their claims, for which they had standing at the time of filing of the suit even if the member did not, continue to present a live controversy. *See, e.g.*, *Worth v. Jacobson*, 108 F.4th 677, 686–87 (8th Cir. 2024) (finding associational plaintiffs "have an unbroken chain of standing" based on successive member declarants).

Second, this argument is flawed because it purports to identify a problem—that the district court might accidentally order relief to an "uninjured plaintiff"—that has no basis in reality. Again, the plaintiffs here are the associations, and an order going to their whole membership will not touch an "uninjured plaintiff." But more than that, even accepting arguendo the Government's framing and considering whether the order will reach an uninjured 18-to-20-year-old, the objection is still hard to understand. The Supreme Court has explicitly condoned membership-wide injunctive relief as appropriate for cases like this, precisely because they are immune to overbreadth problems given that "it can reasonably be supposed that [an injunction], if granted, will inure to the benefit of those members of the association actually injured." *Hunt*, 432 U.S. at 343 (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). By its nature, an injunction such as the one Plaintiffs have sought would afford no relief to an "uninjured" member who is not banned from buying a handgun on account of age or who is 18 to 20 years old and subject to the law but does not desire to acquire a handgun from a licensed dealer.

Third, this argument does not actually defend the district court's injunctive order—which provided relief for all members who were members as of the date of entry of judgment—but rather would support the member-at-the-time-of-filing limitation the Government sought below. It is therefore an odd argument for the Government to make now, after it dismissed its cross-appeal raising that issue.

**B.** The Government attempts to buttress its argument by invoking practical concerns and equitable principles which it claims support limiting relief to exclude individuals who have become members of the associations after the entry of judgment below or who will become members in the future. The Government argues that "[t]he associations here presumably do not accept that future members would be bound by any *loss* the associations suffer in litigation, and if the association cannot bind future members to a loss, they equally cannot claim to bind future members to a win." Gov't Br. at 15. Regardless of what arguments Plaintiff Organizations would make on this issue in future litigation, the Government's argument is a non sequitur. Notably, one of the Government's sources for this and similar equitable concerns is a concurring opinion by Justice Thomas. *See id.* at 15–16 (discussing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) (Thomas, J., concurring)). But as Plaintiffs pointed out in their opening brief, *see* Pls.' Br. at 27–28, the fairness concerns that Justice Thomas raised about the associational standing doctrine *are not the law*, and when he *did* describe the current state of the law, he made clear that "[i]f a single member of an association has suffered an injury, our doctrine permits that association to seek relief for its entire membership." *FDA*, 602 U.S. at 399 (Thomas, J., concurring).

Justice Thomas was correct, and this Court is bound to follow the law as it currently exists. The Supreme Court has previously recognized that, in at least some

circumstances, an association's members may not be bound by a loss in associational litigation from which they might have benefited, without suggesting that the whole edifice of associational standing should be discarded. *See Brock*, 477 U.S. at 290 ("Should an association be deficient [in representing the interests of their members], a judgment won against it might not preclude subsequent claims by the association's members without offending due process principles."). Indeed, Plaintiffs also pointed this out in their opening brief, *see* Pls.' Br. at 27–28, and the Government responds only that *Brock* "applied ordinary standing principles," but did not "resolve[] any scope-of-relief question, much less held that relief should flow to future members of an organizational plaintiff." Gov't Br. at 19. But that is precisely where the Supreme Court's precedent leads, and as Plaintiffs have demonstrated, many courts—including this one and lower courts in this circuit—have endorsed association-wide relief without any such limitations. *See* Pls.' Br. at 15–16; *see also Firearms Pol'y Coal., Inc. v. Bondi*, 805 F. Supp. 3d 721, 733 (N.D. Tex. 2025) (enjoining defendants from banning members of the plaintiff organization from carrying firearms in post offices); *Silencer Shop Found. v. BATFE*, No. 6:25-cv-56, 2026 WL 2255460, at **26–30 (N.D. Tex. Aug. 5, 2026) (enjoining defendants from enforcing several challenged provisions of the National Firearms Act against plaintiffs and their members "both current and future"). The Government has acquiesced to both of those orders, so there is no reason it could not acquiesce in an appropriately scoped

order here as well. *See* Order, *Firearms Pol'y Coal., Inc. v. Blanche*, No. 25-11328 (5th Cir. July 23, 2026), Doc. 56 (dismissing appeal from that decision on the Government's motion); Letter from D. John Sauer, Solicitor General, to Mike Johnson, Speaker of the U.S. House of Representatives re *Silencer Shop Found. v. ATF*, No. 25-cv-056 (N.D. Tex.) (Sept. 24, 2025), https://perma.cc/649C-BZSR (noting the Government had declined to appeal the decision).

The Government also argues that granting injunctive relief to future members conflicts with limits placed on class actions and would permit strategic gamesmanship by individuals who could join an organization to take advantage of an injunction. *See* Gov't Br. at 16. But the practical concerns cut the other way here. As noted above, this case has now been making its way up and down the federal courts for twice as long as any individual 18-year-old member could be adversely affected by the challenged laws. If the Government's position were adopted, the Plaintiff Organizations would effectively be forced to file a never-ending stream of follow-on cases—a "waste of judicial resources as well as the time and resources of the litigants." *Christian Emps. All. v. U.S. Equal Emp. Opportunity Comm'n*, 719 F. Supp. 3d 912, 927 (D.N.D. 2024) (Traynor, J.).

**C.** The Government next argues that, even if not legally *compelled* to narrow its relief, the district court was "[at] an absolute minimum," within the bounds of its discretion when it chose to narrow the relief, explaining that "[i]n determining

whether to enter less than the maximum relief available, a court 'balances the convenience of the parties and possible injuries to them.' " Gov't Br. at 17 (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)). This, too, is inconsistent with precedent. The default disposition in a case like this one, consistent with Article III, is "complete relief." *See* Pls.' Br. at 14–15; *see also Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). And here, given "[t]he Department of Justice's determination that it will not enforce the challenged provisions against anyone, anywhere," Gov't Br. at 1, it is hard to understand how "the convenience of the parties and possible injuries to them" could favor narrowing relief. *Id.* at 17. Rather, there would seem to be, after the OLC's opinion and the Government's representations to this Court in its briefing, simply nothing to put on the other side of the ledger.

The Government unsurprisingly spends little time focusing on the actual harm it would experience from an injunction that completely covers Plaintiffs' members. Rather, it attacks the concept of "complete relief" altogether, suggesting that Plaintiffs have misunderstood it as "relief to everyone potentially affected by an allegedly unlawful act" and not "to the plaintiffs before the court." *Id.* at 20 (quoting *CASA*, 606 U.S. at 852). But this is the same, recurring error the Government makes throughout its brief. *CASA* dealt with injunctions "barring various executive officials from applying the [challenged] policy to *anyone* in the country." *CASA*, 606 U.S. at 839. That is not what Plaintiffs are asking for here. The "plaintiffs before the court"

are, in this case, membership organizations that have standing under Supreme Court precedent to represent their members in court. Granting relief to all of *their* members, regardless of where they live or when they joined, is entirely consistent with *CASA*—anything else leaves the organizations in the same injured profile they were in *before* they filed this suit or *before* they won on the merits before this Court.

The Government faults Plaintiffs for overreading *Mock*'s endorsement of the "complete relief" principle, Gov't Br. at 20, noting that *Mock* declined to conduct a complete preliminary injunction analysis itself and left it to the district court to consider the full slate of factors relevant to that analysis "in the first instance," *Mock*, 75 F.4th at 587. But that does not diminish *Mock*'s value; although it did not undertake the analysis itself, *Mock*'s instructions to the district court made clear that complete relief is the default and that *nationwide* relief, specifically, was appropriate where necessary to accord full relief to an organization whose "membership numbered thousands, and the members were scattered nationwide," and the alternative, of limited relief only to those before the court "would prove unwieldy and would only cause more confusion." *Id.* (quotation marks and citation omitted). The very same is true here.

The Government also argues that the several "decades-old" Supreme Court cases that Plaintiffs have cited as recognizing that associations can get this type of broad relief for their members are inapposite because they "address Article III

standing, not the permissible scope of relief." Gov't Br. at 18. But as Plaintiffs have explained, those cases are *explicitly* premised on the fact that the organization's representative standing is linked to (and only exists where) the organization *can actually get relief for its members*. *See* Pls.' Br. at 12–13; *see also Hunt*, 432 U.S. at 343 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). As for the "decades-old" epithet, the Supreme Court has been very clear that courts are to follow its precedent, even century-old precedent and "leave to this Court the prerogative of overruling its own decisions," even where, as the Government appears to be arguing is the case here with *CASA*, that "precedent is in tension with some other line of decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136, 146 (2023) (quotation marks omitted) (faulting Pennsylvania Supreme Court for not following its precedent and remarking that "[t]his case pose[d] a very old question indeed—one this Court resolved more than a century ago"). Moreover, the Supreme Court has not suggested that the doctrine of associational standing has lost any of its vitality. The Court applied the three-part *Hunt* test for associational standing in *SFFA*. *See* Pls.' Br. at 11. The Government does not discuss the case.

**D.** There is yet one more reason that this Court should reject the Government's position. Extending back even further than the Supreme Court's decisions in *Warth*

and *Hunt*, associational litigation with relief for associational members has deep roots in the common law. *See id.* at 19. The Government is critical of these sources as overlapping with the history of class actions, which the Government stresses are subject to procedural requirements, *see* FED. R. CIV. P. 23, that do not apply to associational suits, *see* Gov't Br. at 21. But that is a harmful fact for the Government, not a helpful one. Rather than a novel form of relief that overextends the equitable authority of the federal courts, as the Government argues, this shared history with class actions shows that the roots of associational standing are at least as deep as those of a procedural mechanism the Government does not dispute is legitimate. Indeed, the associational suit is in many ways superior to the class action such that it renders the procedural protections the Federal Rules mandate for class actions unnecessary—whereas a class action is only "an ad hoc union of injured plaintiffs who may be linked only by their common claims," a representative membership organization is populated with members who often share more and form a natural "class" in suits like this one. *Brock*, 477 U.S. at 289.

**E.** Finally, the Government notably spends very little time discussing the district court's narrowing of the scope of the injunction to encompass only the geographic bounds of the Fifth Circuit, except to say that such a decision was appropriate because "the underlying merits issue was subject to active litigation in other courts—including circuits that had upheld the same provision at issue here or

similar provisions" and other courts of appeals "had, or might, opine on the issue" differently. Gov't Br. at 17–18. It is hard to understand how this defense of the restriction can coexist with the Government's assertion that *no* court should consider this issue further because it is not enforcing the law nationwide *already*. And as for the Government's repeated citations to *CASA*, they do not support it on the geographic restriction either. As Plaintiffs explained, the Supreme Court in *CASA* was explicit that a party-specific injunction can still be nationwide in scope without offending Article III. *CASA*, 606 U.S. at 837 n.1 ("The difference between a traditional injunction and a universal injunction is not so much *where* it applies, but *whom* it protects.").

## CONCLUSION

The district court's order should be reversed and this case should be remanded with instructions that judgment affording complete relief to Plaintiffs' members be entered.

Dated: November 4, 2026

Respectfully submitted,

George J. Armbruster, III
ARMBRUSTER & ASSOCIATES, APLC
332 E. Farrel Road, Suite D
Lafayette, LA 70508
(337) 889-5511
george@arm-assoc.com

/s/ David H. Thompson
David H. Thompson
*Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

/s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this Reply Brief of Plaintiffs-Appellants complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 6,220 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

/s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*